**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Deanna McDermott, | ) | No. CIV 12-407-TUC-LAB |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| Carolyn W. Colvin, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

The plaintiff filed this action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g).

The Magistrate Judge presides over this case pursuant to 28 U.S.C. § 636(c) having received the written consent of both parties.  *See* FED.R.CIV.P. 73; (Doc. 11).

The final decision of the Commissioner is not "supported by substantial evidence and free from legal error."  *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  Specifically, the ALJ improperly discounted the treating physician's opinion and improperly discounted the claimant's subjective testimony of disabling pain and fatigue. The case will be remanded for payment of benefits.

PROCEDURAL HISTORY

On April 12, 2006, McDermott constructively filed an application for disability insurance benefits.  (Tr. 318, 370)   She alleged disability beginning on January 9, 2006, due to fibromyalgia, arthritis, and depression. (Tr. 318, 342)  Her claim was denied initially and upon reconsideration. (Tr. 170-173, 180-182)

McDermott requested review and appeared with counsel at a hearing before Administrative Law Judge (ALJ) Lauren R. Mathon on March 30, 2009 and again on July 1, 2009. (Tr. 27-72, 155)  In her decision, dated November 5, 2009, the ALJ found McDermott was not disabled. (Tr. 155-161)  McDermott appealed, and the Appeals Council remanded the case to the ALJ.  (Tr. 167-169)

McDermott again appeared with counsel at a hearing before ALJ Mathon on November 10, 2010.  (Tr. 119-148)  In her decision, dated December 10, 2010, the ALJ again found McDermott was not disabled because she could return to her job as an accountant.  (Tr. 10-19)  McDermott appealed and submitted an additional medical statement, but the Appeals Council denied review making the decision of the ALJ the final decision of the Commissioner. (Tr. 1-3, 737-38);  *See Bass v. Social Sec. Admin.*, 872 F.2d 832, 833 (9th Cir. 1989).

McDermott subsequently filed this action appealing the Commissioner's final decision. (Doc. 1).  She argues the ALJ failed to properly evaluate the opinions of her treating physicians, the lay evidence, and her own credibility.  (Doc. 30) She further argues the ALJ's use of the vocational expert testimony was error. *Id*.


Claimant's Work History and Medical History

From 1986 to 2006, McDermott worked as an accountant at Eastern Arizona College. (Tr. 324-25, 343)  Her supervisor, Timothy E. Curtis, submitted an affidavit explaining that McDermott was a good worker until she became sick and "began developing problems in concentration, trouble remembering things, and appeared not to feel well."   (Tr. 740, supplement)  Her duties were lessened, but even those accommodations proved inadequate to permit her to continue.  *Id*.  She stopped working after nineteen and one-half years on the job

on January 9, 2006. (Tr. 34, 342)  If she had been able to work for another six months to a year, she would have been eligible for retirement benefits.  (Tr. 52)  In her application for disability benefits, McDermott claims she is no longer able to work due to fibromyalgia, arthritis, and depression.  (Tr. 318, 342)

Physical Impairments

In October of 2005, McDermott was examined by Berchman A. Vaz, M.D., for an evaluation of her fibromyalgia.  (Tr. 434-435) Vaz found "no obvious synovitis" in her joints, but he found "Heberden's and Bouchard's nodes of the small joints of the hands." *Id*.  She had "restriction of movement in the cervical spine and the lumbar spine" and "a few fibromyalgia tender points present." *Id*.  Vaz noted that McDermott had "a long history of fibromyalgia with generalized aches and pains," but he expressed concern that some of her pain could be secondary to worsening depression or osteoarthritis of the neck and spine.  *Id*.

The record contains radiology studies of McDermott's cervical spine, lumbar spine, and hips performed in October of 2005.  (Tr. 447-48)  The radiologist offered the following impression: "1) Prominent degenerative changes at C5-C6;  2) Mild degenerative changes of the lumbar spine, most pronounced at L2-L3; 3) Mild degenerative changes in the hips and symphysis pubis." *Id*.

The medical record contains treatment notes from McDermott's treating physician, Lynn E. Smith, M.D., dating from April of 2006 to April of 2009.  (Tr. 605-613) In April of 2009, Smith assessed McDermott as follows: "1. Severe fibromyalgia. 2.  Anxiety and depression, severe.  3. Allergies."  (Tr. 605)

In April of 2006, Smith completed a Physical Capacities Worksheet.  (Tr. 449-51, 603) He opined that due to fibromyalgia and associated depression, McDermott could walk only 500 feet daily due to "severe pain in joints." *Id*.  She could stand daily for two hours and sit daily

for two hours.[1]  *Id*.  She was restricted in her ability to climb and balance, but she could lift 20 pounds occasionally and 10 pounds frequently.  *Id*.  She could not tolerate temperature extremes, fumes, gasses, or poor ventilation.  *Id*.

The record contains examination and treatment notes from a rheumatologist, Michael Maricic, M.D., taken between July of 2006 and July of 2010.  (Tr. 561-66, 639-45, 701-06)  Maricic noted a positive Epstein-Barr virus titer for IgG early antigen and nuclear antigen.  (Tr. 640)  He assessed McDermott as follows: "1.  Fibromyalgia – 729.0 (Primary).  2.  Depression with anxiety – 300.4."  (Tr. 640)  He noted "[t]he patient does meet [American College of Rheumatology] criteria for fibromyalgia based upon her widespread pain, greater than 11 tender points [in] both the upper and lower extremities and history of sleep disturbance."  (Tr. 640)  He noted "there are no currently approved FDA treatments for fibromyalgia" although Cymbalta shows some promise.  (Tr. 640)  The "most consistently proven beneficial treatment for fibromyalgia" is aerobic exercise.  (Tr. 640)

McDermott was examined by Richard Palmer, M.D., for the state disability determination service in August of 2006.  (Tr. 472-75)  His impression reads as follows: "1. Fibromyalgia with multiple tender points and comorbid symptoms of fatigue, insomnia and headaches.  2.  Signs of arthritis of the right shoulder.  3.  Depression."  (Tr. 475)

Palmer completed a Medical Source Statement of Ability to do Work-related Activities (Physical).  (Tr. 469-71).  He opined that McDermott could lift 20 pounds occasionally and 10 pounds frequently.  *Id*.  She could stand and/or walk for 6-8 hours in an 8-hour day.  *Id*.  She could sit for 6-8 hours in an 8-hour day.  (Tr. 470)  She should only occasionally crouch; crawl; or climb ladders, rope, or scaffolds.  *Id*.

In September of 2006, Anita Stafford, M.D., reviewed the record and completed a Physical Residual Functional Capacity Assessment for the state disability determination service.  (Tr. 505-12)  She concluded McDermott could lift and/or carry 20 pounds occasionally and 10

---

[1]  An inability to sit for more than two hours and stand for more than two hours in an 8-hour work day precludes sedentary or light work.  *See* S.S.R. 96–9P, 1996 WL 374185; S.S.R. 83-10, 1983 WL 31251.

pounds frequently.[2]  (Tr. 506)  She could stand and/or walk with normal breaks for 6 hours in an 8-hour day.  (Tr. 506)  She could sit with normal breaks for 6 hours in an 8-hour day.  *Id.* She should only occasionally balance; crouch; crawl; or climb ladders, rope, or scaffolds.  (Tr. 507)  She should avoid even moderate exposure to vibration and hazards such as machinery and heights.  (Tr. 509)  Stafford explained she adopted Palmer's functional limitations finding Smith's too restrictive.  (Tr. 511)  On the other hand, she stated that McDermott's functional limitations were consistent with the medical evidence and that McDermott "appears mostly credible."  (Tr. 510)

The record contains treatment and examine notes from Goodman Chiropractic between July of 2006 and October of 2010.  (Tr. 531-33, 580-601, 634-37, 707-36).  McDermott reported taking chiropractic treatment on a weekly basis for pain relief.

In April of 2008, John Fahlberg, M.D., reviewed the record and completed a Physical Residual Functional Capacity Assessment for the state disability determination service.  (Tr. 545-52)  He concluded McDermott could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  (Tr. 546)  She could stand and/or walk with normal breaks for 6 hours in an 8-hour day.  (Tr. 506)  She could sit with normal breaks for 6 hours in an 8-hour day.  *Id.*  She should only occasionally kneel; crouch; crawl; or climb ramps or stairs.  (Tr. 547)  She should never climb ladders, rope, or scaffolds.  (Tr. 547)  She should avoid concentrated exposure to fumes, odors, dust, gasses, and poor ventilation and hazards such as machinery and heights.  (Tr. 549)  He stated there was a treating or examining source statement on file, but it did not contain restrictions differing significantly from his own.  (Tr. 551)

In August of 2009, McDermott was given the Any Occupation Evaluation by ProActive Physical Therapy.  (Tr. 648-89)  McDermott's work tolerance included sitting up to 2 hours/day; standing 1 hour/day, walking 20 minutes/day, and lifting/carrying 10 pounds occasionally.  (Tr. 650) She could not tolerate kneeling, squatting, crouching, bending, reaching

---

[2]  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 CFR §§ 404.1567; 416.967.

1  overhead, balancing, or climbing.  (Tr. 650)  In summary, the report states McDermott

2  "demonstrated a less than sedentary work capacity as defined by the Dictionary of Occupational

3  Titles . . . ."  (Tr. 649)

4

5  <u>Mental Impairments</u>

6      In August of 2006, McDermott was examined by Andrew C. Jones, Ph.D., for the state

7  disability determination service.  (Tr. 481)  Jones offered the following diagnosis: "I:

8  Adjustment disorder with depressed mood; II: None; III: Fibromyalgia."  (Tr. 483)  He offered

9  the following summary: "This claimant experiences mild to moderate depressed mood in

10 relationship to chronic pain from fibromyalgia.  As her pain has worsened, her emotional

11 distress as well as ability to concentrate and pay attention have also worsened.  She does report

12 that her level of emotional distress has significantly improved since leaving work."  (Tr. 483)

13     Jones completed a Medical Source Statement of Ability to do Work Related Activities

14 (Mental).  (Tr. 484-90)  In all work related activities, he found McDermott displayed "no

15 evidence of limitation" or was "not significantly limited."  *Id.*

16     In August of 2006, Paul J. Tangeman, Ph.D., reviewed the medical record for the state

17 disability determination service and completed a Psychiatric Review Technique form.  (Tr. 491)

18 He documented affective disorder (adjustment disorder), but he found the impairment not

19 severe.  (Tr. 491, 494)  Upon analyzing the "B" criteria of mental limitations, he found no

20 episodes of decompensation and only mild limitation in activities of daily living; maintaining

21 social functioning; and maintaining concentration, persistence, or pace.  (Tr. 501); *see* 20 C.F.R.

22 Pt. 404, Subpt. P., App. 1, § 12.00.  Tangeman opined that her condition is non-severe.  (Tr.

23 503)

24     In March of 2008, Randall J. Garland, Ph.D., reviewed the medical record for the state

25 disability determination service and affirmed Tangeman's prior assessment.  (Tr. 544)

26     The record contains treatment notes from Gail L. Schwartz, M.D., from March of 2007

27 to December of 2009.  (Tr. 523-26, 568-70, 692)  Schwartz notes McDermott is currently taking

28 Cymbalta (for fibromyalgia), Methylin (central nervous system stimulant), trazodone

(antidepressant), Lunesta, (for insomnia), gabapentin (for insomnia) and ibuprofen (analgesic). (Tr. 569)

After the ALJ issued her opinion, McDermott submitted an additional medical statement from Schwartz. (Tr. 738) In that statement, Schwartz explains that McDermott has "a long history of depression as well as chronic pain and fatigue secondary to fibromyalgia." (Tr. 738) She further explains that McDermott "has problems with quality and quantity of sleep" that results in "fogginess" that prevents her from completing complex tasks. *Id.* Furthermore, "[h]er pain level, mood, and cognitive functioning are unpredictable." *Id.* Accordingly, if she were to attempt working full-time, her performance and attendance would be inconsistent. *Id.*

Third Party Statements

In March of 2009, Carolyn J. Dabbs, "chairman of the Baby Photo Service for the Mt. Graham Regional Medical Center," submitted a statement on McDermott's behalf. (Tr. 420) Dabbs explained that McDermott worked "one day a week for about 2 to 3 hours taking pictures of newborn babies." *Id.* McDermott "appeared to be in a great deal of pain and would tire quickly." *Id.* Eventually, she "asked to be relieved of her duties." *Id.*

McDermott also worked at the Christmas House project "for about 2 hours each day for 2 days." *Id.* She "was unable to sell, take cash, or wait on people but she did sit [in] the room" and greet people. *Id.* Eventually, she "dropped out of the Auxiliary because she just could not participate." *Id.*

In June of 2009, Timothy E. Curtis, one of McDermott's supervisors, submitted a statement describing McDermott's job performance. (Tr. 740, supplement) Curtis explained that he has know McDermott for 15 years. *Id.* She "was a good worker [and] had good motivation." *Id.* Unfortunately, she "began developing problems in concentration, trouble remembering things, and appeared not to feel well." *Id.* Eventually, "the quality of her work severely suffered, and she missed more and more time from work because of her condition." *Id.* Her job duties were modified, but eventually she was unable to continue. *Id.*

1    In June of 2009, Michael McDermott, the claimant's husband, submitted a statement on
2    her behalf.    (Tr. 302-03)  He stated that she has struggled with fibromyalgia since they met.
3    *Id*.  "She seemed to get worse every year until the only thing she could do was go to work then
4    come home and lay down for most of the evening."  *Id*.  Eventually, she had to quit work due
5    to the pain and fatigue.  *Id*.  At first, she paid the household bills each month, but he eventually
6    took over this task because "it was too much stress on her and she would get confused and make
7    mistakes."  *Id*.

8    In November of 2010, Antoinette Griffin, McDermott's daughter, submitted a statement
9    on her behalf. (Tr. 300-01)  Griffin explained that her mother "was always sharp and extremely
10   motivated to work and could multitask in a way that would amaze me."  *Id*.  In 2005, when she
11   was still working,  McDermott would take a break in the middle of the day and come to
12   Griffin's house to lie down for a time.  *Id*.  Eventually, the pain and fatigue forced her to stop
13   working altogether.  *Id*.  When she was well, McDermott could baby-sit Griffin's children and
14   attend their performances.  *Id*.  But, as her condition got worse, she was unable to do these
15   things.  *Id*.  McDermott "missed [her] [grandson's] eighth grade graduation which devastated
16   her, as she really wanted to be there[,] but she was in too much pain and fatigued."  *Id*.

17

18   Hearing Testimony

19   On March 30, 2009, McDermott appeared with counsel at a hearing before ALJ Lauren
20   R. Mathon.  (Tr. 29)  At the time of the hearing, McDermott was 60 years old.  (Tr. 33)

21   McDermott testified she worked at Eastern Arizona College in financial services for
22   nineteen and one-half years. (Tr. 34)  She eventually stopped working due to pain, fatigue, and
23   lack of mental acuity.  (Tr. 35)  If she had been able to stay on the job for another six months
24   to a year, she would have been eligible for retirement benefits.  (Tr. 52)

25   Her pain is most acute in her hips, buttocks, and thighs, but she also has pain in her
26   shoulders and knees. (Tr. 35)   She takes Lunesta, trazodone, Cymbalta, Neurontin, and
27   ibuprofen. (Tr. 37)

28

On July 1, 2009, McDermott appeared with counsel at a supplemental hearing before the ALJ. (Tr. 75)  At that hearing, medical expert Adam Christopher Alexander III, M.D., offered his opinion of McDermott's residual functional capacity [3] based on his review of the medical record.  (Tr. 83) Alexander opined that she could lift or carry 20 pounds occasionally and 10 pounds frequently. (Tr. 89)  She could sit, stand, and/or walk for six hours in an eight-hour day. *Id*.  She could not use ropes, ladders, or scaffolding.  *Id*.  Alexander based his opinion of McDermott's limitations exclusively on the objective medical evidence in the record without considering her subjective reports of pain.  (Tr. 89, 92, 93, 98)  He explained that fibromyalgia has no objective signs and therefore does not result in any "limitations" as he understands the term.  (Tr. 93)

The ALJ took testimony from vocational expert Kathleen McAlpine.  (Tr. 109)  McAlpine testified that McDermott's previous position would be classified as accountant or accountant clerk and that both positions are sedentary skilled occupations.  (Tr. 111) A person with a residual functional capacity as described by Alexander could perform those jobs.  *Id*.  McAlpine further opined that a person whose pain and fatigue caused a loss of mental acuity could not perform those occupations.  *Id*.  And, if a person had to miss more than one day of work per month due to illness, that person could not work.  (Tr. 112)

On November 10, 2010, after remand from the Appeals Council, McDermott appeared with counsel at a third hearing before the ALJ.  (Tr. 119)

McDermott's cousin, Carla Crockett, offered testimony on McDermott's behalf.  (Tr. 139)  Crockett testified that she has known McDermott since they were children.  (Tr. 139)  McDermott once was very energetic and "incredibly brilliant." (Tr. 140)  Afterwards, however, she became increasingly fatigued and mentally foggy. (Tr. 140-41) She once was an excellent cook, but became incapable of reliably following a recipe "she'd made 50 times before."  (Tr. 141) She once was a gifted seamstress, but "it got so we could sew for a few minutes, and I

---

[3] Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 C.F.R. §§ 404.1545, 416.945.

1  would have to check every seam she sewed to make sure it was right or every item she did."

2  (Tr. 141) Crockett explained, "[y]ou know, she made the stupidest, dumbest mistakes on things

3  she'd done forever; just couldn't do it." *Id.*

4

5     CLAIM EVALUATION

6        Social Security Administration (SSA) regulations require that disability claims be

7  evaluated pursuant to a five-step sequential process.  20 C.F.R. §§ 404.1520, 416.920; *Baxter*

8  *v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of

9  whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4),

10  416.920(a)(4).  If so, then the claimant is not disabled, and benefits are denied.  *Id.*

11        If the claimant is not engaged in substantial gainful activity, the ALJ proceeds to step

12  two, which requires a determination of whether the claimant has a "medically severe impairment

13  or combination of impairments."  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  In making a

14  determination at step two, the ALJ uses medical evidence to consider whether the claimant's

15  impairment more than minimally limits or restricts his or her "physical or mental ability to do

16  basic work activities."  *Id.*  If the ALJ concludes the impairment is not severe, the claim is

17  denied.  *Id.*

18        Upon a finding of severity, the ALJ proceeds to step three, which requires a

19  determination of whether the impairment meets or equals one of several listed impairments that

20  the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20

21  C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); 20 C.F.R. Pt. 404, Subpt. P, App.1.  If the claimant's

22  impairment meets or equals one of the listed impairments, then the claimant is presumed to be

23  disabled, and no further inquiry is necessary.  *Ramirez v Shalala,* 8 F.3d 1449, 1452 (9th Cir.

24  1993).  If the claimant's impairment does not meet or equal a listed impairment, evaluation

25  proceeds to the next step.

26        The fourth step requires the ALJ to consider whether the claimant has sufficient residual

27  functional capacity (RFC) to perform past work.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

28  If yes, then the claim is denied.  *Id.*  If the claimant cannot perform any past work, then the ALJ

1   must move to the fifth step, which requires consideration of the claimant's RFC to perform

2   other substantial gainful work in the national economy in view of claimant's age, education, and

3   work experience.  20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

4

5   <u>The ALJ's Findings</u>

6          At step one of the disability analysis, the ALJ found McDermott "has not engaged in

7   substantial gainful activity since January 9, 2006, the alleged onset date . . . ."  (Tr. 12).  At step

8   two, she found McDermott "has the following severe impairments: fibromyalgia, osteoarthritis

9   of the fingers, bunion joints, big toes [] and thumb joints, and status post breast cancer and

10  breast reconstruction . . . ."  (Tr. 12)  At step three, the ALJ found McDermott's impairments

11  did not meet or equal the criteria for any impairment found in the Listing of Impairments,

12  Appendix 1, Subpart P, of 20 C.F.R., Part 404.  (Tr. 15)

13         The ALJ then analyzed McDermott's residual functional capacity (RFC).  She found

14  McDermott "has the residual functional capacity to perform light work . . . except that she

15  should avoid ropes, ladders and scaffolds and sustained and heavy gripping, grasping, and

16  handling on both hands; and she should also avoid unprotected heights and exposure to

17  hazardous moving machinery."  (Tr. 15)

18         At step four, the ALJ found McDermott "is able to perform past relevant work as an

19  accounting and accounting clerk" and therefore is not disabled.  (Tr. 18)

20

21         STANDARD OF REVIEW

22         An individual is entitled to disability benefits if he or she demonstrates, through

23  medically acceptable clinical or laboratory standards, an inability to engage in substantial

24  gainful activity due to a physical or mental impairment that can be expected to last for a

25  continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  "[A]

26  claimant will be found disabled only if the impairment is so severe that, considering age,

27  education, and work experience, that person cannot engage in any other kind of substantial

28

1  gainful work which exists in the national economy." *Penny v. Sullivan,* 2 F.3d 953, 956 (9th Cir.
2  1993).

3      The findings of the Commissioner are meant to be conclusive.   42 U.S.C. §§ 405(g),
4  1383(c)(3).  The decision to deny benefits "should be upheld unless it contains legal error or is
5  not supported by substantial evidence."  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).
6  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept
7  as adequate to support a conclusion."  *Id.*  It is "more than a mere scintilla but less than a
8  preponderance." *Id.*

9      "Where evidence is susceptible to more than one rational interpretation, the ALJ's
10  decision should be upheld." *Orn*, 495 F.3d at 630.  "However, a reviewing court must consider
11  the entire record as a whole and may not affirm simply by isolating a specific quantum of
12  supporting evidence." *Id.*

13      In evaluating evidence to determine whether a claimant is disabled, the opinion of a
14  treating physician is entitled to great weight. *Ramirez v. Shalala,* 8 F.3d 1449, 1453-54 (9th Cir.
15  1993).  The Commissioner may reject a treating physician's uncontradicted opinion only if she
16  sets forth clear and convincing reasons for doing so. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.
17  1995).  If the treating physician's opinion is contradicted by another doctor, the Commissioner
18  may reject that opinion only if she provides specific and legitimate reasons supported by
19  substantial evidence in the record. *Lester,* 81 F.3d at 830.  No distinction is drawn "between
20  a medical opinion as to a physical condition and a medical opinion on the ultimate issue of
21  disability." *Rodriguez v. Bowen*, 876  F.2d 759, 761 n.7 (9th Cir. 1989).

22      "Where medical reports are inconclusive, questions of credibility and resolution of
23  conflicts in the testimony are functions solely of the [Commissioner]." *Magallanes,* 881 F.2d
24  747, 751 (9th Cir. 1989) (punctuation omitted).  The Commissioner's finding that a claimant is
25  less than credible, however, must have some support in the record. *See Light v. Social Sec.
26  Admin.,* 119 F.3d 789 (9th Cir. 1997).

27      The ALJ need not accept the claimant's subjective testimony of disability, but if she
28  decides to reject it, "she must provide specific, cogent reasons for the disbelief." *Lester,*  81

- 12 -

1  F.3d at 834. "Unless there is affirmative evidence showing that the claimant is malingering, the

2  Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing."

3  *Id.* "General findings are insufficient; rather, the ALJ must identify what testimony is not

4  credible and what evidence undermines the claimant's complaints." *Id.*

5

6      DISCUSSION

7      The ALJ committed legal error when she improperly discounted the opinion of

8  McDermott's treating physician, Lynn E. Smith, M.D.  *See Orn v. Astrue*, 495 F.3d 625, 631

9  (9th Cir. 2007). She also improperly discounted McDermott's subjective testimony of disabling

10  pain and fatigue. The court does not reach McDermott's alternative claims of error.

11      "Because treating physicians are employed to cure and thus have a greater opportunity

12  to know and observe the patient as an individual, their opinions are given greater weight than

13  the opinions of other physicians." *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). The

14  Commissioner may reject the treating physician's contradicted opinion[4] only if she sets forth

15  "specific and legitimate reasons supported by substantial evidence in the record." *Lester v.*

16  *Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (punctuation modified);  *see, e.g., Aukland v.*

17  *Massanari*, 257 F.3d 1033, 1037 (9th Cir. 2001) (applying the *Smolen* "specific and legitimate"

18  test to the opinion of a treating physician). "This can be done by setting out a detailed and

19  thorough summary of the facts and conflicting clinical evidence, stating [her] interpretation

20  thereof, and making findings." *Orn v. Astrue*,  495 F.3d 625, 632 (9th Cir. 2007). "The ALJ

21  must do more than offer [her] conclusions." *Id.* "[She] must set forth [her] own interpretations

22  and explain why they, rather than the doctor['s], are correct." *Id.*

23      If the treating source's opinion "is well-supported by medically and acceptable clinical

24  and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

25  in [the] case record," it must be given "controlling weight." 20 C.F.R. § 404.1527(c)(2); §

26

27      _____

28          [4]  Smith's opinion is contradicted by the opinion of the examining consultant, Richard
    Palmer, M.D.  (Tr. 469-80)

1   416.927(c)(2).  If the treating source's opinion is not given controlling weight, the ALJ must

2   nevertheless analyze other factors such as the length, nature, and extent of the treating

3   relationship; the supportability and consistency of the opinion; and the degree of medical

4   specialization possessed by the treating source.  20 C.F.R. § 1527(d)(2 - 6); § 416.927(d)(2- 6);

5   *see also Sameena, Inc. v. U. S. Air Force*, 147 F.3d 1148, 1153 (9ᵗʰ Cir. 1998) ("[A] federal

6   agency is obliged to abide by the regulations it promulgates.").  "In many cases, a treating

7   source's medical opinion will be entitled to the greatest weight and should be adopted even if

8   it does not meet the test for controlling weight."  SSR 96-2p, 1996 WL 374188 at *4.  In sum,

9   the ALJ must "give good reasons" for the weight given to the treating source's opinion.  20

10  C.F.R. § 404.1527(c)(2); § 416.927(c)(2).

11          In this case, McDermott's treating physician, Smith, concluded that she cannot work due

12  to disabling fibromyalgia.  *See* (Tr. 17) ("[He] opined that the claimant was permanently

13  disabled because of severe fibromyalgia.")  Specifically, Smith opined that McDermott could

14  walk only 500 feet daily due to "severe pain in joints."  (Tr. 449-51, 603)  She could stand for

15  2 hours daily and sit for 2 hours daily.  *Id.*  She was restricted in her ability to climb and

16  balance but could lift 20 pounds occasionally and 10 pounds frequently.  *Id.*  She could not

17  tolerate temperature extremes, fumes, gasses, or poor ventilation.  *Id.*

18          The ALJ gave his opinions no weight at all and found McDermott had the physical

19  ability to perform light work relying primarily on the opinion of the state agency physicians.

20  (Tr. 15, 17)  The ALJ's stated reasons for doing so are not "specific and legitimate."

21          The ALJ critiqued Smith's opinion as follows:

22      [T]he claimant's primary care physician, Lynn Smith, M.D., indicated that the
        claimant has severe fibromyalgia with a [sic] vague objective findings that the
23      claimant had multiple joint pains and difficulty with movement . . . [His]⁵
        assessment[s] are exceedingly difficult to substantiate. There is no evidence of
24      [his] objective medical findings, such as physical examination, in the progress
        notes to support the allegations that the claimant has severe disabling
25      fibromyalgia, and [he] appears to base [his] assessment purely upon the
        claimant's subjective complaints.
26
                                    *        *        *
27

28      ⁵ The ALJ incorrectly refers to Smith using the feminine pronoun. *See* (Tr. 37).

                                            - 14 -

> [He] opined that the claimant was permanently disabled because of severe
> fibromyalgia. [His] assessment is not well-supported by the overall objective
> evidence. As noted above, [he] relies on the claimant's subjective complaints and
> [his] notes fail to indicate [his] objective findings to support [his] assessment.

(Tr. 17) In sum, the ALJ discounted Smith's opinion because he failed to support it with objective medical evidence and relied instead on the claimant's subjective complaints.

McDermott, however, suffers from fibromyalgia, "a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissues." *Benecke v. Barnhart*, 379 F.3d 587, 589 (9th Cir. 2004). Fibromyalgia "is diagnosed entirely on the basis of patients' reports of pain and other symptoms." *Id*. at 590. "[T]o date there are no laboratory tests to confirm the diagnosis." *Id*.

Smith's failure to provide objective support for his medical opinion and his reliance on McDermott's subjective reporting of symptoms is understandable given the nature of her disease. Fibromyalgia does not result in objective medical signs. The ALJ unreasonably discounted Smith's opinion based on his failure to supply something that does not exist. The ALJ, therefore, did not supply "specific and legitimate" reasons for discounting his opinion of disability. *See Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004) ("The ALJ erred by effectively requiring 'objective' evidence for a disease that eludes such measurement.") (punctuation modified).

The Commissioner argues in the alternative that Smith's opinions could be properly discounted if they were based primarily on the claimant's subjective complaints and the claimant was not a credible witness. The Commissioner is correct in theory. The court finds, however, that McDermott is a credible witness.

A claimant who alleges disability based on subjective symptoms such as pain or fatigue must establish the existence of an underlying impairment that "could reasonably be expected to (not that it did in fact) produce some degree of symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). "The claimant need not produce objective medical evidence of the pain or fatigue itself or the severity thereof." *Id.* "Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the

symptom." *Id.* "Finally, the claimant need not show that her impairment could reasonably be expected to cause the *severity* of the symptom she has alleged; she need only show that it could reasonably have caused *some* degree of symptom." *Id.* (emphasis added). This approach to the evaluation of a claimant's testimony "reflects the highly subjective and idiosyncratic nature of pain and other such symptoms." *Id.*

Once a claimant makes the required showing "and there is no affirmative evidence suggesting she is malingering, the ALJ may reject the claimant's testimony regarding the severity of her symptoms only if [she] makes specific findings stating clear and convincing reasons for doing so." *Id.* at 1283-84. "[T]he ALJ may consider, for example (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Id.* at 1284. In this case, there is no evidence that McDermott is malingering. Accordingly, the ALJ could discount her subjective testimony of disability only by presented clear and convincing reasons for doing so. This she did not do.

The ALJ explained she did not find McDermott to be credible based on three things: (1) a lack of objective evidence supporting her symptoms, (2) her infrequent visits to her physicians, and (3) the record of her daily activities. The court will consider them in turn.

First, and perhaps foremost, the ALJ objected to the lack of objective medical evidence supporting the alleged severity of McDermott's subjective symptoms. The ALJ stated, "[t]he claimant's alleged limitations are not corroborated by the medical evidence." (Tr. 16) Specifically, she noted that physical examinations "failed to reveal evidence of joint swelling, diurnal variation of pain, synovitis, or effusion, and her joints have retained their normal ranges of motion." *Id.* "The only exception was the lumbar spine which merely showed decreased range of motion with a negative straight leg test bilaterally – findings that would not adequately support her complaints of overall pain and fatigue." (Tr. 16-17)

A claimant, however, need not produce objective medical evidence to verify her level of pain or fatigue. *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). She need only establish that she has an underlying impairment that is expected to cause some degree of symptom, and McDermott has done that. The ALJ accepts that McDermott has fibromyalgia. Accordingly, her objection that McDermott's level of pain and fatigue is not supported by objective evidence is not well taken.

Second, the ALJ objects to the fact that McDermott sees her treating physician, Smith, and her rheumatologist, Maricic, only infrequently. The ALJ notes that McDermott sees Maricic only once every six months. (Tr. 16, 129) She states that McDermott sees Smith only "intermittently." (Tr. 17)

An unexplained failure to seek treatment is recognized as a legitimate reason for discounting a claimant's subjective testimony of disabling pain. *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). Here, however, the record provides an explanation for McDermott's failure to visit her physicians more often.

Maricic's office is located 150 miles[6] away from McDermott's home and travel is very uncomfortable for her. (Tr. 128) She reported, however, that if she has a medical concern, she will contact Maricic using the telephone. (Tr. 129) Accordingly, McDermott's failure to frequently visit Maricic in person is not evidence that her symptoms are less severe than she alleges.

The ALJ also objects to the fact that McDermott only sees Smith "intermittently." (Tr. 17) It is not entirely clear how frequently or regularly the ALJ believes McDermott should be seeing her treating physician. Accordingly, it is difficult to assess this comment. The record does, however, offer an explanation as to why McDermott does not seek treatment from her doctors more frequently and more regularly. Maricic states in no uncertain terms that "there are no currently approved FDA treatments for fibromyalgia." (Tr. 640) Accordingly, it is

---

[6] McDermott lives in Pima, Arizona, near Safford. (Tr. 33) Maricic's office is located in Tucson. (Tr. 128)

1    understandable that McDermott does not frequently and regularly visit those health care

2    providers that have little to offer her in the way of effective treatment. The only medication that

3    Maricic believes has some chance of success is Cymbalta, and McDermott is already taking

4    that. (Tr. 38)

5          McDermott does report that massage and chiropractic treatments are effective in reducing

6    her pain. (Tr. 38)  And she takes those treatments on a weekly basis. (Tr. 17, 38)  It therefore

7    appears that she does regularly and frequently seek treatment for her condition.

8          Considering the intractable nature of McDermott's underlying impairment, her failure

9    to regularly and frequently visit her doctors in person is not evidence that her subjective

10   testimony of disabling pain and fatigue should be discounted.

11         Finally, the ALJ explains that she discounted McDermott's credibility because of her

12   record of daily activities.  Specifically, she notes that McDermott sees her chiropractor weekly,

13   attends church monthly, travels 150 miles to Tucson, shops with the help of an electric cart,

14   works on her computer for one-half hour at a time, and quilts. (Tr. 17)  It does not appear,

15   however, that this collection of activities is inconsistent with her subjective testimony of

16   disabling pain and fatigue.

17         As discussed above, McDermott sees her chiropractor weekly because it reduces her pain

18   and travels 150 miles to Tucson to visit her rheumatologist.  These activities are undertaken

19   because of her condition, not in spite of it.  The fact that she can attend church monthly, shop

20   with the aid of an electric cart, and concentrate on the computer for one-half hour at a stretch

21   hardly seems indicative of an ability to perform substantial gainful activity.  The record

22   indicates that McDermott still can quilt, but her skills are not what they used to be.  Her quilting

23   partner explained that McDermott once was a gifted seamstress, but "it got so we could sew for

24   a few minutes, and I would have to check every seam she sewed to make sure it was right or

25   every item she did." (Tr. 141)   Accordingly, McDermott's continued participation in her

26   quilting hobby is not evidence that justifies discounting her credibility.  The ALJ did not

27   provide clear and convincing reasons for rejecting McDermott's subjective testimony of

28   disability. *See Benecke v. Barnhart*,  379 F.3d 587, 594 (9th Cir. 2004) ("This court has

1   repeatedly asserted that the mere fact that a plaintiff has carried on certain daily activities does

2   not in any way detract from her credibility as to her overall disability." "One does not need to

3   be utterly incapacitated in order to be disabled.") (punctuation modified).

4          In response, the Commissioner argues the *Smolen* "clear and convincing" test is not the

5   law, because it conflicts with the Ninth Circuit's prior statement in *Bunnell* that "an ALJ's

6   credibility findings 'must be sufficiently specific to allow a reviewing court to conclude the

7   adjudicator rejected the claimant's testimony on permissible grounds and did not 'arbitrarily

8   discredit a claimant's testimony regarding pain.'" (Tr. 35, p. 18) (*citing Bunnell v. Sullivan*, 947

9   F.2d 341, 345-46 (9th Cir. 1991) (en banc).  According to the Commissioner, the *Smolen* test

10  impermissibly raises the standard of proof set in *Bunnell*, and because a mere panel decision

11  cannot overrule a prior pronouncement of the court sitting en banc, it is not good law.

12          The Commissioner did not cite to any cases directly supporting her theory, and the court

13  could find none.  But regardless, while the Commissioner correctly states the rule of panel

14  precedent, the court does not believe the *Smolen* "clear and convincing" test is in conflict with

15  the cited passage in *Bunnell.*

16          The *Bunnell* passage discusses the specificity with which the ALJ should craft her

17  opinions.  It does not set a ceiling on the standard of proof that the ALJ must meet in order to

18  justify discounting the claimant's subjective testimony of disabling pain.  The two cases discuss

19  different things.  They are not in conflict.  *See, e.g., Aukland v. Massanari*, 257 F.3d 1033, 1037

20  (9th Cir. 2001) (applying the *Smolen* "specific and legitimate" test).

21          The ALJ improperly discounted McDermott's subjective testimony of disability.

22  Further, she did not provide specific and legitimate reasons for discounting the opinion of her

23  treating physician.  "Where the Commissioner fails to provide adequate reasons for rejecting

24  the opinion of a treating or examining physician, we credit that opinion as a matter of law."

25  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.1996).  "Similarly, where the ALJ improperly rejects

26  the claimant's testimony regarding her limitations, and the claimant would be disabled if her

27  testimony were credited, we will not remand solely to allow the ALJ to make specific findings

28  regarding that testimony." *Id.*  "Rather, that testimony is also credited as a matter of law." *Id.*

1    "Where we conclude that a claimant's testimony or a doctor's opinion should have been

2    credited and, if credited, would have led to a finding of eligibility, we may order the payment

3    of benefits."  *Regennitter v. Commissioner*, 166 F.3d 1294, 1300 (9th Cir.1999);  *see also*

4    *Ghokassian v. Shalala*, 41 F.3d 1300, 1304 (9th Cir.1994) (remanding for payment of benefits

5    where the Secretary did not provide adequate reasons for disregarding the treating physician's

6    opinion);  *Rodriguez v. Bowen*, 876 F.2d 759, 763 (9th Cir.1989);  *Winans v. Bowen*, 853 F.2d

7    643, 647 (9th Cir.1987).

8        In this case, the ALJ improperly discounted the opinion of the claimant's treating

9    physician.  The ALJ also improperly rejected the claimant's subjective testimony of disability.

10    All of this evidence should be credited as a matter of law.  Crediting this evidence indicates

11    McDermott has been disabled since January 9, 2006.  *See Loza v. Apfel*, 219 F.3d 378, 394 (5th

12    Cir. 2000)  ("Factors relevant to the determination of the date of disability include the

13    individual's declaration of the date of when the disability began, work history and available

14    medical history.");  *Swanson v. Secretary*, 763 F.2d 1061, 1066 n.2 (9th Cir. 1985) (The

15    claimant's onset date should be adopted by the Commissioner if it is consistent with the

16    available evidence.); *Willbanks v. Secretary*, 847 F.2d 301, 304 (6th Cir. 1988) (same). Remand

17    of the case would serve no useful  purpose.  *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th

18    Cir. 2004)  ("Allowing the Commissioner to decide the issue again would create an unfair

19    'heads we win; tails, let's play again' system of disability benefits adjudication.");  *Holohan v.*

20    *Massanari* 246 F.3d 1195, 1210 (9th Cir. 2001);  *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir.

21    1996)  ("We may direct an award of benefits where the record has been fully developed and

22    where further administrative proceedings would serve no useful purpose.");  *See also* SSR 96-2p

23    ("If a treating source's medical opinion is well-supported and not inconsistent with the other

24    substantial evidence in the case record, it must be given controlling weight; i.e. it must be

25    adopted.").  McDermott has been waiting for her benefits for more than seven years.  *See, e.g.,*

26    *Podedworny v. Harris*, 745 F.2d 210, 223 (3rd Cir. 1984).  A finding of disability should be

27    entered.

28

1    IT IS ORDERED that the final decision of the Commissioner is reversed.   The case is

2 remanded for payment of benefits.

3    The Clerk of the Court is directed to prepare a judgment and close this case.

4    DATED this 30th day of October, 2013.

5

6

7    _Leslie A. Bowman_____

8    Leslie A. Bowman
     United States Magistrate Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28